IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
SCM GROUP, INC.,

        Plaintiff,                               Civ. No. 10-CV-2414

        v.                                    ECF Case

MCKINSEY & COMPANY, INC.,                 **COMPLAINT**

        Defendant.

-----------------------------------------------------------------x

Plaintiff SCM Group, Inc. ("SCM"), by its undersigned counsel, for its complaint in this action against defendant McKinsey & Company, Inc. ("McKinsey"), alleges as follows:

## THE PARTIES

1.      SCM is a corporation organized under the laws of the State of Missouri, located at 2013 Pilgrim Highway, Frankfort, Michigan, 49635.

2.      Upon information and belief, McKinsey is a corporation organized under the laws of New York with its principal place of business located at 55 East 52nd Street, New York, New York, 10022.

## JURISDICTION

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy is between citizens of different states and exceeds the sum or value of $75,000, exclusive of interest and costs.

4. This Court has personal jurisdiction over McKinsey pursuant to New York Civ. Prac. L & R. § 301 insofar as McKinsey resides and is doing business in New York.

5. Venue is appropriate in this Court pursuant to (i) 28 U.S.C. § 1391(a)(1) because McKinsey resides in this judicial district and all defendants reside in the same State, and under § 1391(a)(2) because a substantial part of the events or omissions giving rise to SCM's claims occurred in this judicial district.

## STATEMENT OF FACTS

**A.  SCM**

6. SCM is in the business of general management consulting and art marketing.

7. Robert Schmidt, the founder and sole shareholder of SCM, began his career in business finance in commercial banking, eventually founding and leading First National Bank's cash management group. Mr. Schmidt later became Vice President-Treasury Operations for American Express's worldwide treasury function and Chairman of American Express Overseas Finance Corporation.

8. American Express was a major client of McKinsey. It was during this period that Mr. Schmidt began to work closely with some of McKinsey top consultants, including Louis Gerstner, who later became Chief Executive Officer of RJR Nabisco and IBM, and Peter Flaherty, who became the senior McKinsey consultant serving American Express for a number of years after Mr. Gerstner left.

9.     Mr. Schmidt later worked as a senior executive and manager in the credit card data processing services industry, the bond insurance industry and the capital management industry.

**B.     McKinsey**

10.     McKinsey is a worldwide management consulting firm that serves as an adviser to the world's leading businesses, governments, and institutions.  Upon information and belief, McKinsey has over 8,700 consultants in 90 consulting offices across 50 countries.

11.     Upon information and belief, McKinsey's clients include three of the world's five largest companies, two-thirds of the Fortune 1000, governments and other non-profit institutions.  Forbes estimated the firm's 2008 revenues at $6.0 billion.

12.     Upon information and belief, McKinsey is organized as a private corporation owned by its employee shareholders, otherwise known as directors ("Director").

13.     Upon information and belief, in or about 1994, McKinsey had approximately 500 Directors worldwide, about half of which were domiciled in the U.S.

**C.     The McKinsey Investment Office**

14.     A significant perquisite for McKinsey's Managing Directors is the ability to invest their personal assets with the McKinsey Investment Office ("MIO"), McKinsey's captive investment company.[1]

---

[1]  The predecessor to MIO was Paul Harris Management ("Paul Harris"), another McKinsey captive investment office.  Paul Harris was later supplanted by MIO.  All references herein to McKinsey's captive investment unit shall be to MIO and shall include Paul Harris where necessary.

3

15. In or about 1994, Richard Moskowitz was the head of MIO. MIO reported to the investment board (the "Investment Board"), which included senior McKinsey Directors.

16. MIO delivered extraordinary returns on investment for McKinsey's Directors. The investment vehicles that MIO offered to McKinsey's Directors consisted largely of private hedge funds that MIO created and managed.

17. As is well known, private hedge funds are able to take advantage of alternative investments that are not available to regular mutual funds and other traditional investment vehicles offered to the general public because many of the SEC regulations that apply to standard mutual funds do not apply to hedge funds.

18. By in or about 1994, McKinsey's Directors had more than $1 billion invested with MIO.

**D.     McKinsey's Problem**

19. A significant amount of MIO's returns were income from short term trading, which was taxable as ordinary income for the Directors. As a result, when the Directors' MIO investments made money, they resulted in high annual tax liabilities for the Directors.

20. Mr. Flaherty, in addition to knowing Mr. Schmidt when he was the McKinsey partner in charge of the American Express account, was the Chair of McKinsey's Investment Board that oversaw MIO. In response to the Directors' grumblings about having to pay taxes on their MIO returns, Mr. Flaherty discussed with Mr. Schmidt his exploring opportunities to mitigate the tax burden.

21. In or about the fall of 1994, Mr. Flaherty met with Mr. Schmidt in New York. Mr. Flaherty explained that McKinsey's business goal was to achieve the same return from MIO without the corresponding tax bite for its Directors.

22. As Mr. Flaherty and Mr. Schmidt discussed McKinsey's needs, it became clear that what Mr. Flaherty was after was a financial instrument that mimicked the investing flexibility and returns of private hedge funds, with the tax privileged status of certain insurance products.

23. During that first meeting, Mr. Flaherty stated that McKinsey was prepared to invest of $100 million of MIO's portfolio into such a new tax-deferred hybrid financial product. Mr. Schmidt advised Mr. Flaherty that he would think about their conversation and get back to him.

**E.     Solving McKinsey's Problem**

24. Upon reflection, it was clear to SCM that this would be a complicated task. Combining the aggressive aspects, and big returns, of hedge fund investments with the conservative, and tax deferred, profile of an insurance product had never been successfully done before in the United States. There were numerous regulatory hurdles to overcome, including federal securities rules and regulations, the U.S. tax code, and the various state insurance regulations. Mr. Schmidt knew that the SEC, the IRS and the state insurance commissioners would be formidable obstacles to overcome to solve this particular riddle.

25. After reflecting upon McKinsey's needs, SCM set up a second meeting with McKinsey.

26. The second meeting, which was attended by Mr. Flaherty and Roger Kline, another senior McKinsey Director, and Mr. Schmidt, took place at McKinsey's New York headquarters.

27. Mr. Kline and Mr. Flaherty again expressed their interest in SCM finding a solution to McKinsey's problem.

28. Mr. Schmidt agreed that SCM would undertake the assignment.

29. It was decided that Mr. Moskowitz, MIO's manager, would work closely with Mr. Schmidt and SCM on the project.

30. Mr. Schmidt discussed his belief that the financial product that would provide the profile required by McKinsey—high returns, tax deferred—was a private placement variable annuity (the "Variable Annuity").

31. A variable annuity is essentially a tax-deferred investment vehicle that comes with an insurance contract, usually designed to protect the annuitant from a total loss in capital. Due to the insurance element, or "wrapper," earnings inside the variable annuity product grow tax-deferred, and the account is not subject to annual contribution limits like those on other tax-favored vehicles like IRAs and 401(k)s.

32. Typically, annuitants can choose from a menu of standard mutual funds provided by the annuity contract, which are known as "sub-accounts." The types of investments that insurance companies can offer in annuity contracts, however, are generally restricted to relatively safe bond and equity mutual funds and money market funds.

33. United States insurance companies are regulated on a state-by-state basis by state insurance commissioners. When the state insurance regulators first

6

permitted the inclusion of equity investments in an insurance product (*e.g.*, variable life products) the regulations were tight and required conservative equity investments (similar to conservative mutual funds) so that the individuals purchasing the products would be protected from loss caused by adverse market fluctuations.

34.     Moreover, the IRS, being adverse to losing tax receipts, was careful in monitoring the deferred tax status of life insurance products, like variable annuities. The tax deferred status of variable annuities was allowed, but only under certain controlled circumstances.

35.     Particularly complicated in the problem McKinsey had presented to SCM was the issue of control over the ultimate insurance product. Typically, an annuitant, pursuant to a contract, selects investment choices for his or her premiums that were paid to, controlled and administered by the insurance company. McKinsey, however, was clear that the final product had to be structured such that MIO maintained complete control over the investments.

36.     McKinsey and SCM agreed that Mr. Schmidt would pursue the Variable Annuity idea on McKinsey's behalf.

37.     Mr. Schmidt stated that he would begin researching and indentifying prospective insurance companies immediately.

38.     At this second meeting, Mr. Flaherty and Mr. Klein reiterated Mr. Flaherty's statement at the first meeting with Mr. Schmidt that McKinsey would convert $100,000,000 of the over $1 billion of funds already under MIO's management to the new hybrid financial product soon after its launch.

39. Mr. Kline added two points: (1) that McKinsey's name be kept private in the early phase of the assignment until a insurance company was selected, and (2) that the cost to McKinsey beat 50 basis points (*i.e.*, a one-half of one percent annual fee based upon the amount of money invested in the final product).

40. At this second meeting, Mr. Kline, Mr. Flaherty and Mr. Schmidt also discussed SCM's compensation in connection with developing the Variable Annuity.

41. Mr. Schmidt proposed a flat fee together with a percentage of the amount invested by the MIO in the product to be developed by SCM (what Mr. Schmidt referred to as an "elevator ride"), that would allow SCM to share in the upside success of the Variable Annuity.

42. Although the specifics were not discussed at that meeting, McKinsey's representatives generally agreed with Mr. Schmidt's concept for SCM's fee.

**F.    Identifying An Insurance Company**

43. The next step in moving the Variable Annuity project forward was to identify an insurance company that had the ability, resources and sophistication to provide the necessary insurance platform.

44. Out of the hundreds of potential qualified insurance companies, SCM identified approximately 30 insurance companies that had the requisite experience and sophistication to partner with McKinsey and MIO.

45. SCM, in coordination with McKinsey, began the process of winnowing these insurance companies from the original 30 down to a handful. As part of that undertaking, a "situation document" or request for proposal ("RFP") was sent to each of the identified 30 insurance companies.

46. The RFP was reviewed and approved by McKinsey before it was distributed.

47. The RFP included some of the following generic information about the client and specifications SCM provided about the contemplated insurance product:

(a) a major firm with about $1 billion in assets under investment for their management group was looking to set up a series of variable annuities to offer the management group a new, tax deferred investment;

(b) the amount of the initial investment would be at least $100,000,000;

(c) the annuity investments in the new variable annuity would reflect the existing investments made by the firm for its management group;

(d) the firm had already chosen the five fund types that would form the new variable annuity's sub-accounts;

(e) the firm would assign its own managers to the funds and would handle the administration of the funds; and,

(f) the cost to the firm should beat 50 basis points.

48. Points (b) and (f) were significant. It was clear to all the insurance company contenders that the insurance product being proposed was clearly cutting-edge and faced significant regulatory hurdles and oversight. And while 50 basis points (or 1/2 of one-percent) in fees was small generally, it was miniscule for such a complicated investment product.

49. The only factor that made it feasible for the prospective insurance companies, and SCM to provide its extensive services in developing the Variable Annuity, was the $100,000,000 in funds that McKinsey committed to investing promptly in the new investment product.

50. As McKinsey knew, without that investment commitment, no insurance company would have expressed any interest in the Variable Annuity at the fee level McKinsey was offering to pay.

51. It was also significant that MIO itself would create and manage the sub-accounts and administer the Variable Annuity's investment account bookkeeping functions. Such an arrangement was highly unusual and would require significant work to successfully shepherded through the regulatory maze.

52. SCM received several positive responses to the RFP. Over the next three months, Mr. Schmidt participated in numerous meetings and conference calls with interested insurance companies interested in learning more about the Variable Annuity program.

53. In light of the non-standard nature of the Variable Annuity parameters, SCM's communications and meetings were often with an insurance company's president, chief investment or chief financial officer, and other high-ranking company executives. In addition, SCM needed to assure itself that it was reaching the proper channels of authority.

54. For SCM, the most critical element of developing the Variable Annuity was to indentify an insurance company that possessed a number of qualifying traits, including:

   (a) the ability to meet the Firm's price (50 basis points as the collar);
   (b) responsiveness and ability to provide "best of class" service;
   (c) a solid ownership, book of business and strategic view;
   (d) financial strength as reflected by the various ratings agencies; and, particularly key,

(e) an excellent relationship with their own state insurance commissioner.

55. After a lengthy and time consuming process, SCM and McKinsey reduced the field to two insurers, American General, based in Houston, Texas and Security Benefit Life Insurance Company ("Security Benefit"), based in Topeka, Kansas.

56. During this period, Mr. Moskowitz and Mr. Schmidt discussed SCM's fee, including the amount of an "elevator ride" SCM would require for developing the Variable Annuity.

57. In reliance on McKinsey's repeated commitment to initially fund the Variable Annuity with $100,000,000, Mr. Schmidt proposed a flat fee of $110,000 (including expenses) plus an "elevator ride" equal to 3 basis points (or 3/100ths of one-percentage point) of the money invested in the Variable Annuity pool.

58. Mr. Moskowitz indicated that Mr. Schmidt's proposal was reasonable, and accepted the terms.

59. In or about late January and early February 1995, Mr. Schmidt and Mr. Moskowitz planned a trip to American General and Security Benefit to review those insurers' final presentations.

60. On February 1, 1995, Mr. Schmidt and Mr. Moskowitz met with executives from Security Benefit. Security Benefit provided Mr. Schmidt and Mr. Moskowitz with their final presentation.

61. During the Security Benefit presentation, Mr. Schmidt and Mr. Moskowitz expressed their positive reaction and it became clear that Security Benefit was the favorite.

11

62. Security Benefit had recently coordinated a program for a major money management firm so their team was well-organized and it was expected that their internal and external legal staffs would be well-positioned to accommodate McKinsey.

63. In order to show its good faith and cement the arrangement, Security Benefit lowered its fee below the numbers it previously presented to SCM and McKinsey to 40 basis points on the first $50 million invested in the Variable Annuity and 35 basis points on amounts invested in excess of $50 million. In addition, Security Benefit agreed that there would be no increase in pricing in the future, a significant and highly favorable deal point for McKinsey.

64. McKinsey knew that Security Benefit based its reduced bid on McKinsey's representations that its early investments in the Variable Annuity would aggregate $100,000,000.

65. At that meeting, Mr. Schmidt and Mr. Moskowitz advised Security Benefit that SCM and McKinsey wanted to work with Security Benefit in developing the Variable Annuity. Security Benefit was extremely pleased with that news.

**G.    Regulatory Approval**

66. Although SCM and McKinsey had selected an insurance partner to help them develop the Variable Annuity, there was still much work to be done before the Variable Annuity could be funded. For the next one and one-half-years, SCM, Security Benefit and McKinsey modified and refined the Variable Annuity many times until it was ready to be offered to McKinsey's Directors.

67. Much time was spent in meetings and teleconferences between and among SCM, Security Benefit's executives and counsel and McKinsey's representatives and counsel reviewing and discussing the Variable Annuity's form.

68. In addition, much time was spent shepherding the Variable Annuity through the state insurance commissioner's office,[2] and developing legal and accounting opinions that the Variable Annuity would need to satisfy the various federal regulations and agencies, in particular the IRS.

69. Much time was also spent addressing tax issues regarding diversification requirements in the Internal Revenue Code and investor control issues and implementing corresponding changes to the Variable Annuity's form.

70. The Variable Annuity was finally ready in or about June 1997. As described above, like typical variable annuities, the Variable Annuity contained a number of sub-accounts into which the annuitant, in this case McKinsey's Directors, could allocate his or her premium. Unlike typical annuities, however, the Variable Annuity sub-accounts were created and managed not by Security Benefit, but by McKinsey/MIO. Indeed, the Variable Annuity's sub-accounts were essentially clones of the hedge fund investment accounts that MIO was already offering its Directors, without the "insurance wrapper," and the tax deferred status. Such sophisticated, structured, private investments were highly unusual for variable annuity investments.

71. In addition, the assets of the Variable Annuity would be wholly managed by MIO, not by Security Benefit's money managers, which was also highly unusual. MIO would also be handling all of the back-office bookkeeping and accounting

---

[2] After much research and communications with state insurance departments, it was decided that the Variable Annuity would be sold in Ohio through an existing McKinsey Cleveland, Ohio office.

13

related to the Variable Annuity. Thus, the MIO would provide Security Benefit with pricing and performance information so that Security Benefit could reflect the necessary actuarial and insurance accounting on its books and provide the Variable Annuity's investors with regular annuity-like reports.

**H.  The SCM Consulting Agreement**

72.  In putting the pieces into place to launch the Variable Annuity, one of the issues that had to be addressed was the payment of SCM's "elevator ride" payments.

73.  For the convenience of McKinsey, SCM and Security Benefit, the parties all agreed that administration of the payment would be handled by Security Benefit.

74.  In June 1997, at or about the time the Variable Annuity was ready for launch, SCM and Security Benefit entered into a "Consulting Agreement."

75.  The Consulting Agreement recited SCM's contributions to the Variable Annuity and the resulting agreements between Security Benefit and McKinsey (the "McKinsey Agreements"), pursuant to which the Variable Annuity would be marketed to McKinsey's Directors.

76.  The Consulting Agreement further stated that Security Benefit desired SCM to be available to provide further services to Security Benefit, but that, in light of the value of the services provided to date, SCM would still be entitled to collect a fee even if no additional services were provided.

77. Under the Consulting Agreement, Security Benefit was required to pay to SCM ".03% (3 basis points) of the average daily net assets of all accounts which support" the Variable Annuity (the "SCM Fee").

78. Under the Consulting Agreement, the funds Security Benefit would use to pay the SCM Fee were to be paid by McKinsey, and the Consulting Agreement explicitly stated that Security Benefit would have no obligation to pay the SCM Fee unless it received the required funds from McKinsey.

79. The SCM Fee is the same fee that Mr. Schmidt had proposed to McKinsey, and that McKinsey had accepted, as SCM's fee for its work on the Variable Annuity.

80. SCM agreed to the SCM Fee in reliance on McKinsey's representation that McKinsey would make an investment of $100,000,000 from MIO into the Variable Annuity soon after its launch.

81. The Consulting Agreement provided that the SCM Fee would be paid in installments on a quarterly basis, and that the Consulting Agreement would terminate on March 17, 2007.

I.   **McKinsey Fails to Adequately Fund the Variable Annuity**

82. After the Consulting Agreement and McKinsey Agreements were executed, and contrary to what McKinsey had represented when the McKinsey and SCM had agreed on the SCM fee, McKinsey breached its commitment to fund the Variable Annuity at $100,000,000 soon after its launch.

83. Instead, by December 1997, six months after the Variable Annuity was eligible for investments, McKinsey had allocated only $13.7 million from MIO to the Variable Annuity.

84. By June 2000, three years after the Variable Annuity was launched, McKinsey had allocated only $36.3 million to the Variable Annuity

85. It was not until March of 2006, more than nine years after the Variable Annuity was launched, that the Variable Annuity reached the $100,000,000 level.

86. Upon information and belief, the Variable Annuity, has shown extraordinary returns for McKinsey's Directors. And, upon information and belief, the Variable Annuity continues to provide McKinsey's Directors extraordinary, tax deferred, results.

87. McKinsey's Directors would not be enjoying the benefit of these types of tax deferred returns but for SCM's hard work and effort developing the Variable Annuity.

**J.    SCM Engages in Good Faith Discussions with McKinsey**

88. Under the terms of the Consulting Agreement, the full amount of the SCM Fee could not be determined until the term of the Consulting Agreement was completed.

89. As the termination date for the Consulting Agreement approached, however, it became clear to Mr. Schmidt that the SCM Fee was going to be far less that what SCM originally contemplated because MIO's early investments were far less than represented and its subsequent investments did not make up for the initial shortfall.

90. As a result, starting in early 2007, and continuing through mid-2009, Mr. Schmidt met with a number of McKinsey Directors and internal counsel to address the fact that, due to McKinsey having failed to fund the Variable Annuity as anticipated, the SCM Fee did not fairly compensate SCM for the services rendered.

91. During this period, Mr. Schmidt met or communicated with Timothy Church, MIO's head after Mr. Moskowitz, Cynthia Ivanick, McKinsey's Director of Investment Counseling, Todd Tibbets (who worked for Mr. Church), and Casey Liscomb, a McKinsey lawyer, to try to resolve SCM's grievance.

92. Mr. Schmidt's communications with McKinsey, although cordial, routinely consisted of McKinsey expressing an interest in resolving the problem, followed by delay, hold-ups and complete inaction.

93. Finally, Mr. Schmidt solicited Mr. Kline's involvement in an attempt to bridge the impasse. Mr. Kline told Mr. Schmidt that he would look into the matter to seek resolution.

94. After speaking with his colleagues, Mr. Kline reported back to Mr. Schmidt with good news: Mr. Kline promised that McKinsey would make good on its promise to compensate SCM based on McKinsey's original funding representations.

95. Unfortunately, McKinsey never fulfilled Mr. Kline's promise.

96. To date, McKinsey, a company that prides itself on obtaining the right outcome, has failed or refused to provide SCM with just compensation for its phenomenally successful efforts.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Unjust Enrichment)

97. Plaintiff incorporates paragraphs 1- 96 of this complaint as if fully set forth herein.

98. SCM performed services in good faith in developing the Variable Annuity on behalf and for the benefit of McKinsey.

99. McKinsey was fully aware that SCM was providing services on McKinsey's behalf, and accepted both the services provided by SCM, as well as the benefit of those services.

100. For services rendered, SCM reasonably expected to be compensated.

101. SCM provided services without a written agreement between the parties covering these services.

102. SCM is entitled to recover from McKinsey the reasonable value of the services rendered by SCM to McKinsey, which will be determined at trial, but which is not less than $1,000,000.

### SECOND CAUSE OF ACTION
### (Breach of Contract)

103. Plaintiff incorporates paragraphs 1-96 of this complaint as if fully set forth herein.

104. In 2007, Mr. Kline, speaking for McKinsey, orally promised SCM that McKinsey would compensate SCM at the level the parties contemplated when they first agreed on the fee to be paid to SCM for its work on the Variable Annuity.

105. McKinsey never fulfilled, and therefore breached, that promise to SCM.

106. As a result of McKinsey's breach of its promise to SCM, SCM has suffered damages in an amount to be determined at trial, but not less than $1,000,000.

### THIRD CAUSE OF ACTION
### (Breach of Contract/Third-Party Beneficiary)

107. Plaintiff incorporates paragraphs 1-96 of this complaint as if fully set forth herein.

108. The Consulting Agreement obligated Security Benefit to pay certain funds received from McKinsey to SCM.

109. The payments from Security Benefit to SCM under the Consulting Agreement were made, in whole or in part, to satisfy McKinsey's fee obligation to SCM for SCM's work in developing the Variable Annuity.

110. Upon information and belief, the McKinsey Agreements are valid and enforceable.

111. Upon information and belief, the McKinsey Agreement was intended, in part, to satisfy McKinsey's obligations to SCM via payments made to Security Benefit under the McKinsey Agreements, which are specifically referenced in the Consulting Agreement.

112. Upon information and belief, the McKinsey Agreements were based, in part, on McKinsey's promise to make contributions through MIO into the Variable Annuity aggregating $100,000,000 soon after the product was launched.

113. McKinsey breached the McKinsey Agreements by failing to make contributions to the Variable Annuity aggregating of $100,000,000 soon after the produce

was launched and/or by failing to make sufficient future contributions to make up for the initial shortfall.

114. As a direct result of McKinsey's breach, SCM did not receive reasonable compensation for its work in developing the Variable Annuity under the Consulting Agreement.

115. McKinsey is liable to SCM, as a third-party beneficiary under the McKinsey Agreements, in an amount to be determined at trial, but not less than $1,000,000.

## **JURY DEMAND**

116. SCM demands a trial by jury on all claims and issues so triable.

WHEREFORE, the SCM demands judgment as follows:

A. On the first, second and/or third causes of action, damages to be determined at trial in an amount not less than $1,000,000;

B. Granting SCM pre-judgment and post-judgment interest, attorneys' fees, costs and disbursements of this action; and

C. For such other and further relief as this Court deems just and proper.

Dated:  New York, New York,
        March 16, 2010

                            GREENBERG FREEMAN LLP

                            By:    /s/ *Michael A. Freeman*
                                Michael A. Freeman (MAF-9600)
                                110 East 59th Street, 29th Floor
                                New York, NY  10022
                                (212) 838-3121
                                *Attorneys for Plaintiff SCM Group*