UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SCM GROUP, INC.,

                       Plaintiff,                         **MEMORANDUM OPINION**
                                                                  **& ORDER**

        v.

MCKINSEY & COMPANY, INC.,                      10 Civ. 2414 (PGG)

                       Defendant.

PAUL G. GARDEPHE, U.S.D.J.:

        This action concerns a fee dispute arising from an alleged 1994 oral agreement between Plaintiff SCM Group, Inc. and Defendant McKinsey & Company, Inc. The Amended Complaint pleads claims for unjust enrichment and breach of contract. McKinsey has moved to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, McKinsey's motion to dismiss will be granted.

## BACKGROUND

        SCM, a Missouri corporation with its principal place of business in Michigan, is a management consulting firm founded and owned by sole shareholder Robert Schmidt, formerly an executive at First National Bank and American Express. (Am. Cmplt. ¶¶ 1, 6-7) McKinsey, a management consulting firm, is a New York corporation with its headquarters in New York. (Id. ¶¶ 2, 10, 26)

        In the fall of 1994, Peter Flaherty, a senior McKinsey managing director, met with Schmidt in New York to discuss McKinsey's interest in developing a new long-term investment product. (Id. ¶¶ 8, 12, 20-21) Flaherty was then the chair of the investment board for the McKinsey Investment Office ("MIO"), a captive investment unit at McKinsey that manages

private assets for McKinsey's managing directors.  (Id. ¶¶ 14, 20)  The MIO invests largely in private hedge funds that it creates and manages.  (Id. ¶ 16)

During the fall 1994 meeting, Flaherty told Schmidt that the MIO was interested in developing a new investment vehicle for McKinsey's investor directors.  Because short term trading generated much of the MIO's returns, and thus was taxed as ordinary income, the directors' MIO investments resulted in high annual tax liability.  (Id. ¶¶ 19-23)  The MIO sought an investment product that "mimicked the investing flexibility and returns of private hedge funds" but that offered "the tax privileged status of certain insurance products."  (Id. ¶ 22)  Flaherty allegedly told Schmidt, during the fall 1994 meeting, that the MIO "was prepared to invest [] $100 million of [the] MIO's portfolio into such a new tax-deferred hybrid financial product."  (Id. ¶ 23)  Schmidt agreed to "think about" the product Flaherty described, and to contact him later.  (Id.)

Schmidt arranged a second meeting to discuss the hybrid financial product Flaherty sought.  This second meeting, attended by Flaherty and Roger Kline, another senior McKinsey director, took place at McKinsey's New York headquarters.  (Id. ¶ 26)  At this meeting, Flaherty and Kline again expressed interest in having Schmidt and SCM develop the hybrid financial product that had been discussed, and Schmidt agreed to do so.  (Id. ¶¶ 27-28)  Schmidt explained that he believed a private placement variable annuity would satisfy the MIO's needs.  (Id. ¶¶ 30-31)  Flaherty and Kline agreed that Schmidt should explore the variable annuity idea on McKinsey's behalf, and Schmidt "stated that he would begin researching and identifying prospective insurance companies immediately."  (Id. ¶¶ 36-37)  At this meeting, Flaherty and Kline represented that the MIO would invest $100 million in the new hybrid financial product "soon after its launch."  (Id. ¶ 38)

At this second New York meeting, Flaherty, Kline, and Schmidt also discussed SCM's compensation for developing the new investment product for the MIO. (Id. ¶ 40) Schmidt "proposed a flat fee together with a percentage of the amount invested by the MIO in the product to be developed by SCM." (Id. ¶ 41) Although the specifics of SCM's compensation were not discussed, Flaherty and Kline "generally agreed with Mr. Schmidt's concept for SCM's fee." (Id. ¶ 42)

Schmidt and SCM then began work on developing a variable annuity product, identifying insurance companies that could provide the necessary "platform." (Id. ¶¶ 43-55) SCM prepared a request for proposal ("RFP") – reviewed and approved by McKinsey – which it sent to thirty insurance companies. The RFP stated, inter alia, that the amount of McKinsey's "initial investment would be at least $100,000,000." (Id. ¶¶ 45, 47) The Amended Complaint alleges that the $100 million initial investment was "the only factor that made it feasible for the prospective insurance companies" to participate and for "SCM to provide its extensive services." (Id. ¶ 49)

While Schmidt searched for an appropriate insurance company partner, he also further discussed SCM's compensation with Richard Moskowitz, the MIO's manager. (Id. ¶¶ 15, 29, 56) "In reliance on McKinsey's repeated commitment to initially fund the Variable Annuity with $100,000,000, Mr. Schmidt proposed a flat fee of $110,000 (including expenses) plus an 'elevator ride' equal to 3 basis points (or 3/100ths of one percentage point) of the money invested in the Variable Annuity pool." (Id. ¶ 57) Moskowitz allegedly "indicated that Mr. Schmidt's [fee] proposal was reasonable, and accepted the terms." (Id. ¶ 58)

On February 1, 1995, at a meeting attended by Schmidt and Moskowitz, SCM and McKinsey advised Security Benefit Life Insurance Company ("SBL") that it had been selected to

develop the variable annuity product.  (Id. ¶¶ 60, 65)  Over the next year and a half, SCM, SBL, and McKinsey worked to prepare the variable annuity for introduction to McKinsey's directors.  (Id. ¶¶ 66-69)

On March 11, 1997, McKinsey, SBL, and certain of their subsidiaries entered into three agreements which govern the marketing of the variable annuity to McKinsey directors as well as the parties' "overall relationship" (the "McKinsey Agreements").  (Id. ¶ 75; see also Declaration of Karin A. DeMasi in Support of Defendant's Motion to Dismiss ("DeMasi Decl."), Ex. 3 (Product Development and Master Agreement); Ex. 4 (Administrative Services Agreement); Ex. 5 (Advisory Agreement)).[1]  SCM is not a party to the McKinsey Agreements.  (DeMasi Decl., Ex. 3 (Product Development and Master Agreement); Ex. 4 (Administrative Services Agreement); Ex. 5 (Advisory Agreement))

On June 2, 1997, when the variable annuity was ready for launch, SCM and SBL entered into a "Consulting Agreement."  (Am. Cmplt. ¶ 74; DeMasi Decl., Ex. 6 (Consulting Agreement) at 1)  The Consulting Agreement notes that SBL has entered into the McKinsey Agreements and that SCM has "provided consulting services to [SBL] relating to the creation of the McKinsey Agreements."  (DeMasi Decl., Ex. 6 (Consulting Agreement) at 1)  The Consulting Agreement further recites that "[SBL] and SCM desire that SCM be available to provide certain services to [SBL] from and after the date of this Agreement."  (Id. at 1)  The Consulting Agreement expressly acknowledges, however, that "SCM is not a party to the McKinsey Agreements."  (Id. at § 6(b)).  With respect to SCM's fee, the Consulting Agreement provides that SBL will pay SCM a fee "equal, on an annual basis to .03% (3 basis points) of the

---

[1]  Because the Amended Complaint relies on both the McKinsey Agreements and the Consulting Agreement discussed below, they are properly considered on Defendant's motion to dismiss.  Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006).

4

average daily net assets of all accounts which support [the group variable annuity contract]." (Id. at § 2)  Fees are to be paid "within: (i) sixty (60) days after the end of each calendar quarter; or (ii) 15 days of the date [SBL] receives payment from McKinsey, whichever is later."  The first payment was scheduled for the calendar quarter ending June 30, 1997.  (Id.)  The Amended Complaint alleges that the fee described above is "the same fee that Mr. Schmidt had proposed to McKinsey, and that McKinsey had accepted, as SCM's fee for its work" in developing the variable annuity.  (Am. Cmplt. ¶¶ 77, 79)  By its terms, the Consulting Agreement terminates on March 17, 2007.  (Id. ¶ 81; DeMasi Decl., Ex. 6 (Consulting Agreement) at § 5)

The Amended Complaint alleges that McKinsey "breached its commitment to fund the Variable Annuity at $100,000,000 soon after its launch [in June 1997]."  (Am. Cmplt. ¶ 82)  "[B]y December 1997, six months after the Variable Annuity was eligible for investments, McKinsey had allocated only $13.7 million from [the] MIO to the Variable Annuity."  (Id. ¶ 83)  By June 2000, three years after launch, "McKinsey had allocated only $36.3 million to the Variable Annuity."  (Id. ¶ 84)  "It was not until March of 2006, more than nine years after the Variable Annuity was launched, that the Variable Annuity reached the $100,000,000 level."  (Id. ¶ 85)  SCM alleges that the McKinsey directors participating in the variable annuity program have reaped "extraordinary, tax deferred, results."  (Id. ¶ 86)

Between early 2007 and mid-2009, Schmidt met with a number of McKinsey directors to complain that – because McKinsey had "failed to fund the Variable Annuity as anticipated" – SCM would not be fairly compensated for the services it had rendered.  (Id. ¶¶ 90-92)  Although Kline allegedly told Schmidt "that McKinsey would make good on its promise to compensate SCM based on McKinsey's original funding representations," this promise was not fulfilled.  (Id. ¶¶ 93-96)  SCM filed this action on March 17, 2010.

5

**DISCUSSION**

The Amended Complaint sets forth causes of action for unjust enrichment and for breach of contract, based on SCM's contention that the parties intended that SCM be a third-party beneficiary of the McKinsey Agreements.  McKinsey has moved to dismiss on numerous grounds, including that SCM's claims are time-barred; that SCM's unjust enrichment claim is precluded by the Consulting Agreement; that McKinsey did not breach any of the McKinsey Agreements; and that SCM is not a third-party beneficiary of the McKinsey Agreements.

**I.    LEGAL STANDARD**

"To survive a motion to dismiss, a claim must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)). Additionally, "[w]here a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).

The Court will first address McKinsey's statute of limitations arguments, and then turn to the merits of SCM's claims.

## II.   SCM'S CLAIMS ARE TIME-BARRED

### A.   Unjust Enrichment

"When a nonresident sues on a cause of action accruing outside New York, CPLR 202 requires the cause of action to be timely under the limitation periods of both New York and the jurisdiction where the cause of action accrued." Global Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 527 (N.Y. 1999).[2] Where, as here, "an alleged injury is purely economic," the cause of action accrues "where the plaintiff resides and sustains the economic impact of the loss." Id. at 529. In such cases, the situs of the economic injury is plaintiff's principal place of business.

---

[2] CPLR § 202 states: "An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply."

See, e.g., MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 701 F. Supp. 2d 518, 530-31 (S.D.N.Y. 2010).

Here, the parties agree that under CPLR § 202, because SCM is located in Michigan, the applicable period of limitations must be determined under Michigan law. (Def. Br. 9; Pltf. Br. 1) The parties disagree, however, as to whether Michigan's three-year or six-year limitations period applies. While Michigan law is not entirely clear on this point, the Court concludes that the six-year limitations period applies to SCM's unjust enrichment claim, which is founded on SCM's allegation that McKinsey breached an express promise to invest $100 million in the variable annuity vehicle in June 1997. See Romeo Inv. Ltd. v. Mich. Consol. Gas Co., No. 260320, 2007 WL 1264008, at *8 (Mich. Ct. App. May 1, 2007) ("A claim for unjust enrichment is the equitable counterpart of a legal claim for breach of contract," and thus "we choose to apply the same six-year period of limitations to the unjust enrichment claim as to that applicable to plaintiff's breach of contract claim."); Huhtala v. Travelers Ins. Co., 257 N.W.2d 640, 644 (1977) (applying six-year limitation period to promissory estoppel claim based on alleged "breach of an express promise"); but see Philips v. Daktronics, Inc., No. 07-CV-14662, 2008 WL 324248 (E.D. Mich. Feb. 5, 2008) (concluding, without analysis, that three-year limitations period applies to unjust enrichment claims).

In Michigan, a claim for unjust enrichment "accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results." Mich. Comp. Laws § 600.5827 (2010). To trigger the running of the limitations period, an alleged wrong need only be "actionable." Connelly v. Paul Ruddy's Equip. Repair & Serv. Co., 200 N.W.2d 70, 72-73 (1972) ("Later damages may result, but they give rise to no new cause of action. . . ."); see also Moll v. Abbott Labs., 506 N.W.2d 816, 825 (1993); Matter of Easterbrook's Estate, 319

N.W.2d 655, 659 (1982) (holding that breach of an alleged agreement to transfer stock "immediately" occurred, if at all, "when [the deceased] failed to immediately transfer the stock").

Here, SCM filed its action on March 17, 2010.  Accordingly, for SCM's unjust enrichment claim to be timely, SCM's claim must have accrued no later than March 17, 2004.  However, the "wrong upon which [SCM's unjust enrichment] claim is based," see Mich. Comp. Laws § 600.5827, is that McKinsey "breached its commitment to fund the Variable Annuity at $100,000,000 soon after its launch [in June 1997]."  (Am. Cmplt. ¶ 82)  The Amended Complaint further alleges that six months later, McKinsey "had allocated only $13.7 million from [the] MIO to the Variable Annuity."  (Id. ¶ 83)  Accepting these allegations as true, SCM was on notice no later than December 1997 that McKinsey had breached its alleged oral promise to deposit $100 million into the variable annuity program.  Accordingly, SCM's unjust enrichment claim is untimely.

SCM argues, however, that because the Consulting Agreement between SCM and SBL "called for installment payments . . . SCM's claims to recover for underpayments did not accrue until each payment was first due."  (Pltf. Br. 6-7)  Under Mich. Comp. Laws § 600.5836, "claims on an installment contract accrue as each installment falls due."  SCM's argument, however, is self-defeating.  As discussed in Part III infra, to the extent that SCM relies on the Consulting Agreement for its unjust enrichment claim, that claim is precluded.  Michigan (like New York) bars a claim for unjust enrichment "[w]hen there is an express contract covering the same subject matter."  Romeo Inv. Ltd., 2007 WL 1264008, at *7 ("With respect to the claim for unjust enrichment, we conclude that the entire claim should have been dismissed because, in

9

part, it was time-barred, and, in part, there was a failure to state a claim because of the existence of an express contract.").[3]

B. **Breach of Contract**

As noted above, CPLR § 202 requires New York courts to apply Michigan's statute of limitations when determining the timeliness of SCM's breach of contract claim. Contract claims in Michigan, as in New York, are subject to a six-year statute of limitations. See Mich. Comp. Laws § 600.5807(8) (2010); CPLR § 213(2). "The period of limitations for a cause of action alleging breach of contract commences on the date that the contract is breached." Matter of Easterbrook's Estate, 319 N.W.2d at 659. "[T]he breach occurs . . . when the promisor fails to perform under the contract." Blazer Foods, Inc. v. Rest. Properties, Inc., 673 N.W.2d 805, 809 (2003); see also Harris v. City of Allen Park, 483 N.W.2d 434, 436 (1992). "A plaintiff need not know of the invasion of a legal right in order for the claim to accrue." Harris, 483 N.W.2d at 436.

Here, SCM's breach of contract claim is premised on the theory that the McKinsey Agreements obligate McKinsey to deposit $100 million into the variable annuity program, and that SCM is a third-party beneficiary of the McKinsey Agreements. Assuming arguendo that this is so, as discussed above, the Amended Complaint pleads that McKinsey "breached its commitment to fund the Variable Annuity at $100,000,000 soon after its launch [in June 1997]." (Am. Cmplt. ¶ 82) Accordingly, SCM could have brought its breach of

---

[3] To the extent that SCM alleges that every periodic payment by SBL somehow constitutes a continuing breach by McKinsey – even though McKinsey was not a party to the Consulting Agreement – Michigan has rejected such a "continuing wrong" doctrine in the context of a claim for breach of contract where the claim is based on a single breach. See Romeo Inv. Ltd., 2007 WL 1264008, at *7; Blazer Foods, Inc. v. Rest. Properties, Inc., 673 N.W.2d 805, 812 (Mich. Ct. App. 2003). Here, the Amended Complaint pleads a single breach: that "McKinsey breached its commitment to fund the Variable Annuity at $100,000,000 soon after its launch." (Am. Cmplt. ¶ 82)

contract/third party beneficiary claim as early as 1997, see Matter of Easterbrook's Estate, 319 N.W.2d at 659, but it failed to make such a claim until 2010. Under the applicable six-year statute of limitations, SCM's breach of contract claim is time-barred.

## II.     UNJUST ENRICHMENT

Even if SCM's unjust enrichment claim were not time-barred, it would fail on its merits. There is no dispute here that SCM's compensation for its work on the variable annuity program is governed by the Consulting Agreement. There is likewise no dispute that the Consulting Agreement is a valid contract. Where, as here, it is undisputed that an express and valid contract governs the right at issue, unjust enrichment claims are precluded.

### A.     The Consulting Agreement Governs SCM's Right to Compensation

The Amended Complaint contains numerous provisions acknowledging that SCM's right to compensation for its work on the variable annuity program is governed by the Consulting Agreement:

> For the convenience of McKinsey, SCM and [SBL], the parties all agreed that administration of the payment [to SCM] would be handled by [SBL] [under the Consulting Agreement]. (Am. Cmplt. ¶ 73);
> 
> Under the Consulting Agreement, [SBL] was required to pay to SCM ".03% (3 basis points) of the average daily net assets of all accounts which support" the Variable Annuity. (Id. ¶ 77 (quoting DeMasi Decl., Ex. 6 (Consulting Agreement), § 2(a)));
> 
> Under the Consulting Agreement, the funds [SBL] would use to pay the SCM Fee were to be paid by McKinsey, and the Consulting Agreement explicitly stated that [SBL] would have no obligation to pay the SCM Fee unless it received the required funds from McKinsey. (Id. ¶ 78)
> 
> The SCM Fee [under the Consulting Agreement] is the same fee that Mr. Schmidt had proposed to McKinsey, and that McKinsey had accepted, as SCM's fee for its work on the Variable Annuity. (Id. ¶ 79);
> 
> The payments from [SBL] to SCM under the Consulting Agreement were made, in whole or in part, to satisfy McKinsey's fee obligation to SCM for SCM's work in developing the Variable Annuity. (Id. ¶ 105);

> [I]n light of the value of the services provided to date, SCM would still be entitled to collect a fee [under the Consulting Agreement] even if no additional services were provided.  (Id. ¶ 76);
>
> Under the terms of the Consulting Agreement, the full amount of the SCM Fee could not be determined until the term of the Consulting Agreement was completed.  (Id. ¶ 88); and
>
> The Consulting Agreement provided that the SCM Fee would be paid in installments on a quarterly basis. . . . (Id. ¶ 81)

The Consulting Agreement further provides that it "contains the entire agreement and understanding of the parties with respect to the subject matter hereof."  (DeMasi Decl., Ex. 6 (Consulting Agreement), § 9)

In sum, SCM's right to compensation for its work on the variable annuity program is governed by the Consulting Agreement.  As discussed below, where an express and valid contract exists concerning the rights at issue, quasi-contract claims such as unjust enrichment are precluded.

### B.    Applicable Law

The parties dispute whether New York, Kansas, or Michigan law applies to SCM's unjust enrichment claim.  "As a general matter, a district court sitting in diversity jurisdiction applies the choice-of-law rules of the state in which it sits." Comprehensive Habilitation Servs., Inc. v. Commerce Funding Corp., 2009 WL 935665, at *10 (S.D.N.Y. Apr. 7, 2009) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999)).  Accordingly, "New York law will apply for purposes of determining which state's substantive law will govern the claims in this case." Id. (citing Wall v. CSX Transp., Inc., 471 F.3d 410, 415 (2d Cir. 2006)).

The Consulting Agreement provides that it "shall be governed by and construed in accordance with the laws of the State of Kansas."  (DeMasi Decl., Ex. 6 (Consulting

12

Agreement), § 12)  "[U]nder New York law, [however,] extra-contractual claims are outside the scope of contractual choice-of-law provisions."  Comprehensive Habilitation Servs., Inc., 2009 WL 935665, at *10 (citing Finance One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 335 (2d Cir. 2005), cert. denied, 548 U.S. 904 (2006); Klock v. Lehman Bros. Kuhn Loeb, Inc., 584 F. Supp. 210, 215 (S.D.N.Y. 1984)).

In determining whether the law of New York, Michigan, or Kansas applies here, "the first step . . . is to determine whether an actual conflict of laws exists."  Id. (citing Wall, 471 F.3d at 415; Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998); In re Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 223 (1993)).  "If no conflict is found between the law of the forum and any other jurisdiction whose law is invoked, then the Court should apply the law of the forum." Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Pub. Co., 580 F. Supp. 2d 285, 290 (S.D.N.Y. 2008) (citing Excess Ins. Co. v. Factory Mut. Ins. Co., 2 A.D.3d 150, 151 (1st Dept. 2003), aff'd, 3 N.Y.3d 577 (2004)); see also Eagle Access, LLC v. BHA, Inc., No. 05 Civ. 2837, 2007 WL 193725, at *3 (S.D.N.Y. Jan. 25, 2007) ("Under New York law, the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved; if no conflict exists, then the inquiry ends." (citing Stolarz, 81 N.Y.2d at 223)).  Here, this Court need not decide which state's law applies, because under the laws of all three potentially applicable jurisdictions – New York, Kansas, and Michigan – SCM's unjust enrichment claim must be dismissed.

Unjust enrichment is an equitable doctrine.  It is well-settled in New York, Kansas, and Michigan that where there is a valid and enforceable written contract governing a particular subject matter, recovery in quasi-contract for acts relating to the same subject matter is precluded.  See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448

13

F.3d 573, 587 (2d Cir. 2006) ("'The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.'" (quoting Clark-Fitzpatrick, Inc. v. Long Island R.R., 70 N.Y.2d 382, 388 (1997))); Goldman v. Met. Life Ins. Co., 5 N.Y.3d 561, 572 (2005) ("The theory of unjust enrichment lies as a quasi-contract claim.  It is an obligation the law creates in the absence of any agreement.  Here, in each case, there was no unjust enrichment because the matter is controlled by contract." (citing State of New York v. Barclays Bank of N.Y., 76 N.Y.2d 533, 540 (1990); Clark-Fitzpatrick, 70 N.Y.2d at 388); Midwest Asphalt Coating, Inc. v. Chelsea Plaza Homes, Inc., 243 P.3d 1106, 1110 (Kan. Ct. App. 2010) ("Recovery for payment under the terms of a contract and quantum meruit are mutually exclusive legal concepts." (citing Whan v. Smith, 285 P. 589, 591 (Kan. 1930))); Ice Corp. v. Hamilton Sundstrand Inc., 444 F. Supp. 2d 1165, 1171 (D. Kan. 2006) ("Kansas law is clear that quasi-contractual remedies, such as unjust enrichment, are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue.  Moreover, courts applying Kansas law have concluded that quantum meruit and restitution are not available theories of recovery when a valid, written contract addressing the issue exists." (internal citations omitted)); Romeo Inv. Ltd., 2007 WL 1264008, at *8 (unjust enrichment claim barred under Michigan law "[w]hen there is an express contract covering the same subject matter").[4]

---

[4] The fact that McKinsey is not a signatory to the Consulting Agreement does not salvage SCM's unjust enrichment claim.  See, e.g., Vitale v. Steinberg, 307 A.D.2d 107, 111 (1st Dept. 2003) ("the existence of . . . an express contract governing the subject matter of plaintiff's claims[] also bars the unjust enrichment cause of action against the individual defendants, notwithstanding the fact that they were not signatories to that agreement"); Bellino Schwartz Padob Adv. v. Solaris Mktg. Group, 222 A.D.2d 313 (1st Dept. 1995) ("The existence of an express contract between Solaris and plaintiff governing the subject matter of the plaintiff's

In sum, because SCM's right to compensation for its work on the variable annuity program is expressly governed by a contract that the parties agree is valid, SCM's unjust enrichment claim is precluded and must be dismissed.[5]

## III.    BREACH OF CONTRACT

Even if SCM's breach of contract/third-party beneficiary claim under the McKinsey Agreements were not untimely, it would fail on its merits because (1) SCM has conceded that McKinsey has no obligation under the McKinsey Agreements to deposit $100 million into the variable annuity program, and thus did not commit any breach of these agreements by failing to do so; and (2) the relevant McKinsey Agreement expressly provides that it confers no rights or remedies on third parties.

As an initial matter, the parties agree that Kansas law governs SCM's breach of contract claim.  (Def. Br. 21-22; Pltf. Br. 16-17)  The McKinsey Agreements provide that Kansas law governs their construction and interpretation.  (DeMasi Decl., Ex. 3 (Product Development and Master Agreement), § 10.7)  In New York, "[a]bsent fraud or a violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction."  Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 393 (2d Cir. 2001) (citation omitted).  Here, SBL is located in Kansas (Am. Cmplt. ¶ 55), which is also the place of contracting.  (Id. ¶¶ 59-60, 65)  Accordingly, this Court will decide SCM's breach of contract claim under Kansas law.

---

claim also bars any quasi-contractual claims against defendant Titan, as a third party nonsignatory to the valid and enforceable contract between those parties.").

[5]  Because SCM's unjust enrichment claim is time-barred and precluded by the Consulting Agreement, this Court does not reach McKinsey's statute of frauds argument.  SCM does not dispute, however, that if New York law governs, its unjust enrichment claim is barred by New York's statute of frauds.  (See Pltf. Br. 8-12)

A.      **There Was No Breach of Contract**

Under Kansas law, a prerequisite for a breach of contract claim – whether brought by a party to the contract or a third party beneficiary – is that the underlying contract has been breached. Hossain v. Rauscher Pierce Refsnes, Inc., 46 F. Supp. 2d 1164 (D. Kan. 1999) ("One may sue for damages resulting from the breach of a contractual obligation as a third-party beneficiary if he or she was an intended beneficiary of that obligation[,]. . . . [but] [t]he person must show . . . that there has been a breach of the contract [and] that there exists a provision in the contract that operates to his or her benefit." (citing United States v. United Servs. Automobile Ass'n, 968 F.2d 1000, 1002 (10th Cir. 1992) (applying Kansas law)).

The Amended Complaint asserts that "McKinsey breached the McKinsey Agreements by failing to make contributions to the Variable Annuity aggregating [] $100,000,000 soon after the produc[t] was launched."  (Am. Cmplt. ¶ 109)  The McKinsey Agreements are before the Court, however, and they contain no such obligation.  (See DeMasi Decl., Ex. 3 (Product Development and Master Agreement); Ex. 4 (Administrative Services Agreement); Ex. 5 (Advisory Agreement))  Moreover, in its opposition brief, SCM concedes that the McKinsey Agreements contain no such obligation. (Pltf. Br. 21 (explaining that "[a]t the time the amended complaint was drafted, SCM had not seen, and did not have access to, the McKinsey Agreements"; "It appears from the [Product Development and Master Agreement] . . . that McKinsey and Security Benefit, without SCM's knowledge, agreed to [] different funding timeframes and thresholds. . . ."))  Because (1) the McKinsey Agreements – which are properly before this Court on Defendant's motion to dismiss – conclusively show that McKinsey had no obligation to invest $100 million in the variable annuity program; and (2) SCM has conceded that McKinsey had no such obligation under the McKinsey Agreements, SCM has failed to make out a breach of contract, and thus cannot prevail on its third party beneficiary claim.  See Gray v.

Manhattan Med. Ctr., Inc., 18 P.3d 291, 299 (Kan. Ct. App. 2001) (a third party's rights under a contract are "no greater than those of the promisee under the contract" (internal citations omitted)).

### B. SCM is Not an Intended Third-Party Beneficiary

Under Kansas law, even if a plaintiff and defendant are not in privity, "a qualified third-party beneficiary plaintiff [may] enforce a contract expressly made for his or her benefit even though he or she was not a party to the transaction." State ex rel. Stovall v. Reliance Ins. Co., 107 P.3d 1219, 1230-31 (Kan. 2005). "Contracting parties are presumed to act for themselves and therefore an intent to benefit a third person must be clearly expressed in the contract." Noller v. GMC Truck & Coach Div., 772 P.2d 271, 275 (Kan. 1989) (internal citations omitted). "The intention of the parties is to be determined from the instrument itself where the terms are plain and unambiguous." Id. (citing Fasse v. Lower Heating & Air Conditioning, Inc., 736 P.2d 930 (Kan. 1987)). "'Before the issue is reached of whether a third party may directly enforce a contract . . . the third party must show the existence of some provision in the contract that operates to his benefit.'" Stovall, 107 P.3d at 1231 (quoting Hartford Fire Ins. Co. v. Western Fire Ins. Co., 597 P.2d 622, 632 (Kan. 1979)).

Here, there is no evidence in the McKinsey Agreements that McKinsey and SBL intended to confer a benefit on SCM. None of the McKinsey Agreements mention SCM, the SCM Fee, or the Consulting Agreement. To the contrary, the most relevant McKinsey Agreement – the Product Development and Master Agreement (DeMasi Decl., Ex. 3) – explicitly excludes the possibility of third-party beneficiaries:

> 10.10 **Third Party Beneficiaries.** This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and assigns. Nothing herein expressed or implied is intended or shall be construed to confer upon or give any person, firm or corporation, other than the parties hereto

> and their respective successors and assigns, any rights or remedies under or by reason of this Agreement.

(DeMasi Decl., Ex. 3 (Product Development and Master Agreement), § 10.10)  Kansas courts honor such provisions in determining contracting parties' intent.  See Noller, 772 P.2d at 275 (denying third-party rights under a dealership agreement where "the provisions of the Dealership Agreement indicate [that the contracting parties] did not have an intention to benefit a third party").

SCM's breach of contract/third party beneficiary claim will be dismissed.

## IV.     THIS ACTION WILL BE DISMISSED WITHOUT LEAVE TO AMEND

In its opposition brief, SCM requests leave to amend its complaint – for a second time – to remedy any defects the Court perceives.  (Pltf. Br. 21)  "Once a responsive pleading has been served, 'a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.'"  Jones v. New York State Div. of Military & Naval Affairs, 166 F.3d 45, 50 (2d Cir. 1998) (quoting Fed. R. Civ. P. 15(a); citing Hemphill v. Schott, 141 F.3d 412, 420 (2d Cir. 1998)).  "However, a district court may properly deny leave when amendment would be futile."  Id. (citing Foman v. Davis, 371 U.S. 178, 182 (1962); Electronics Communications Corp. v. Toshiba America Consumer Prods., Inc., 129 F.3d 240, 246 (2d Cir.1997)).

As this opinion makes clear, SCM's claim against McKinsey suffers from a number of serious obstacles.  SCM has no written agreement of any sort with McKinsey.  The written agreements that do exist do not require McKinsey to make a $100 million deposit into the variable annuity program.  Those written agreements likewise do not provide SCM with a cause of action to complain about McKinsey's failure to promptly make a $100 million deposit.  Indeed, the written agreements undermine any argument SCM might have to recover against

McKinsey. Finally, the claim SCM wishes to bring against McKinsey became ripe 14 years ago. Because SCM has failed to show that further amendment would not be futile, Defendant's motion to dismiss will be granted without leave to amend. See Jones, 166 F.3d at 50.

## CONCLUSION

For the reasons stated above, McKinsey's motion to dismiss is GRANTED. The Clerk of the Court is directed to terminate the motion (Dkt. No. 9) and to close this case.

Dated: New York, New York
March 28, 2011

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge